UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

```
_____ :
                                :
In re EASTMAN KODAK COMPANY     :
SECURITIES LITIGATION           :
                                :Civil Action No. 6:05-CV-6326-MAT
_____ :
                                :     DECISION
This Document Relates to:       :     and ORDER
                                :
     ALL ACTIONS                :
_____ :
```

## INTRODUCTION

This is a class action lawsuit brought on behalf of individuals ("class members" and/or "plaintiffs") who purchased or otherwise acquired Kodak securities between April 23, 2003 and September 25, 2003. Plaintiffs claim that Eastman Kodak Company ("Kodak"), CEO, Daniel A. Carp ("Carp"), CFO, Robert H. Brust ("Brust") and Controller, Robert P. Rozek ("Rozek") (all three referred to collectively as "Individual Defendants," and in combination with Kodak as "defendants") violated federal securities laws by issuing false statements and/or misrepresenting the financial condition and economic prospects of Kodak because they failed to disclose that: (1) Kodak was experiencing significant financial pressure from competitors; (2) Kodak's core film and paper business was declining (and as a consequence of the foregoing, Kodak was forced to make significant cuts to its dividend to pay for substantial restructuring expenses); (3) Kodak's future profits would decline due to the switch from the high-margin film products to the less profitable digital technology; and (4) Kodak's statements regarding its growth and progress lacked all reasonable basis when made.

Kodak denies plaintiffs' claims and moves to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, as well as the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 et seq.  For the reasons set forth below, I hereby grant defendants' motion and dismiss plaintiffs' complaint with prejudice.

### BACKGROUND

Plaintiffs are a class of Kodak's shareholders between April 23 and September 25, 2003 (the "Class Period").  Plaintiffs claim that during the Class Period, defendants issued false and misleading statements and press releases to the investing public concerning the Company's efforts with respect to the conversion from film photography to digital photography.  Plaintiffs claim that several confidential witnesses have confirmed that Kodak's depiction of its prospects going forward made during the class period were without reasonable basis because it's core product (film) would not sell in the second quarter of 2003.  Specifically, plaintiffs claim that Kodak had over loaded its retail market with "multi-packs" of film toward the end of 2002.  The situation was so serious that Kodak sustained a $184 million loss at the end of 2002 due to customer rebates.

According to plaintiffs, Kodak's April 2003 earning's projection was further inflated because it assumed the receipt of revenues from the sales of "mini-labs" (and embedded Series 3200 software).  However, it was allegedly widely understood that these mini-labs were not ready for use by Kodaks retail customers because

2

of persistent problems with the software program.  Plaintiffs claim that Kodak was well aware that the Series 3200 software was fatally flawed ten months before the start of the Class Period, yet decided to bring it to market anyway.  Further, plaintiffs contend that due to the software defects from the Kodak mini-labs, certain retailers such as Walgreen's cancelled all of its orders and instead purchased mini-labs from Fuji.  Consequently, plaintiffs claim that Kodak was on the losing end of the competition with Fuji since Fuji was taking over a good portion of Kodak's business at the retail level.  But, according to plaintiffs, Kodak failed to deal with the increased competition with Fuji.

Kodak, on the other hand, asserts that it repeatedly warned of the competitive reality facing the Company by stating publicly that "[p]rice competition continues to exists in all marketplaces [and Kodak] faces competition from other electronics manufacturers in this market space [consumer digital products], particularly on price and technological advances."  See Ex. A, p. 4.

Plaintiffs claim that on April 23, 2003 defendants forecasted in a press release and again on a conference call with analysts that "if current trends continued," second-quarter earnings would increase per share.  Moreover, in response to a question regarding whether "everything is on track" relative to the roll-out of Kodak's series 3200 photo mini-lab system, defendant Carp claimed "Yeah, its gone fine.  Everything will be rolling out through the U.S. in May this year ... the customer reception has been good."

Plaintiffs cite examples in their Complaint of allegedly false and misleading statements made by the defendants. Plaintiffs claim that in a press release entitled "Kodak Reports 1st Quarter Net Income of 4 Cents Per Share; Sales Rise 1 Percent to $2.740 Billion," Carp commented on the results stating in part as follows:

> In these difficult times, Kodak continues to deliver on its commitment to shareholders by managing well those things within our control and by pursuing our strategies for growth, ... **We contained costs and strengthened the financial position of the company by paying down debt, compared with the year-ago level,** and by driving money-saving operational improvements through our Kodak Operating System.  We also benefitted from the company's broad-based product portfolio, as solid demand for Health Imaging and Entertainment Imaging products and services helped offset the reduced demand for consumer film caused by the weak economy. [Emphasis added].

At the earnings conference held the same day, Carp assured investors that:

> If current trends in the consumer business continue into the second quarter, it is possible that the second quarter operating earnings could fall in a range of 60 to 80 cents per share.  However, we saw a pick up in consumer film consumption, we would see an upside to this . . .
>
> Consistent with this view, our full year outlook is now falling at the low end of our $2.95 to $2.35 per share operational earnings range that we provided you in January.  **It is interesting and also encouraging to note that our second quarter out look, if one excludes the traditional consumer business from the analysis, is actually forecasted to grow revenues in the 5 to 9% range**. While our traditional consumer markets are experiencing challenging times, I am pleased with our share performance. Our focus on cost and cash and

4

> the results of our nontraditional consumer
> business.  Our digital portfolio continues to
> gain traction in the market with consumer
> digital cameras continuing their journey
> toward profitability. [Emphasis added].

Plaintiffs assert that contrary to Kodak's assurances that all was well, Kodak had already begun formally considering cutting its dividend in April 2003. Nevertheless, according to plaintiffs, defendants sought to appease shareholders rights before asking them to veto attempts to control the compensation structure of Kodak's senior executives.  On May 7, 2003 the shareholders' proposal to place a check on executive compensation was defeated.  However, Kodak claims that the executive compensation program, which includes three components: base salary, short-term variable pay and long-term incentive, was set forth in its 2003 Annual Proxy Statement.  One month later, on June 18, 2003, defendants publicly cut Kodak's second quarter earnings guidance in half, attributing the reduction to poor film sales in the U.S. and China.  This announcement caused Kodak's stock to drop 10%.  On September 25, 2003, Kodak announced that it would cut its dividend by 72% and that the film sales would continue to decline by 7% per year for the foreseeable future.

Plaintiffs claim that Kodak knew or recklessly disregarded the fact that the misleading statements and omissions set out in the Complaint would adversely affect the integrity of the market for Kodak's stock and would cause the price of Kodak's common stock to become artificially inflated. Further, plaintiffs allege that the defendants acted with scienter in that defendants, by and through

their employees, knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of Kodak were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  In addition, plaintiffs claim that they have identified the allegedly misleading statements, explained why the statements were false or misleading and specified who made them and where and when they were made.

Defendants move to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 et seq.  Defendants assert that plaintiffs do not meet the stringent pleading standards required for private securities fraud claims.  In addition, defendants' contend that their forward-looking statements projecting Kodak's expected earnings are not actionable and plaintiffs have not adequately alleged that Kodak's earning's projections were materially false and misleading.  Furthermore, Kodak contends that plaintiffs have not adequately alleged the requisite scienter for securities claims and that the Complaint fails to allege loss causation.

## DISCUSSION

### I.   Defendants' Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of the complaint where the plaintiff has failed to state a claim upon which relief can be granted.  The court, when evaluating a Rule 12(b)(6) motion must ascertain, after presuming all factual allegations in the pleading to be true and viewing them in the light most favorable to the plaintiff, whether or not the plaintiff has stated any valid ground for relief. Ferran v. Town of Nassau, 11 F.3rd 21, 22 (2d cir. 1993).  The court may grant a Rule 12(b)(6) motion only where "`it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

However, the court is not required to accept every allegation set forth in the plaintiffs' complaint.  Legal conclusions alleged in the complaint need not be accepted by the court.  Segarra v. Messina, 153 F.R.D. 22, 28 (N.D.N.Y. 1994).  Nor are unsupported conclusions or unwarranted inferences based on factual allegations required to be accepted by the court. See In re Verifone Sec. Litig., 11 F.3d 865, 868 (9th Cir. 1993) ("[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim"); Landy v. Mitchell Petroleum Tech. Corp., 734 F.Supp. 608, 615 (S.D.N.Y.) (finding that the court need not accept a strained interpretation of factual

allegations when considering 12(b)(6) motion). Therefore, the court, while bound to accept plaintiffs' factual allegations as true, is not required to accept the plaintiffs' conclusions or inferences based on those facts.

## II.  <u>Private Securities Litigation Reform Act of 1995</u>

Defendants seek dismissal of plaintiffs' securities law claims on various grounds.  First, defendants argue that plaintiffs have failed to allege with particularity that any "false" statement was made with scienter that was attributable to the defendants.  Kodak points to the PSLRA which "heightened the requirement for pleading scienter to the level used by the Second Circuit: plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" <u>Press v. Chem. Inv. Serv. Corp.</u>, 166 F.3d 529, 537-38 (2d Cir. 1999). Under the PSLRA test, plaintiffs must "either (1) allege facts showing that [defendants] had both motive and opportunity to commit fraud, or (2)...allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Id.</u> at 538. The PSLRA also requires fraud plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  To determine whether plaintiffs' pleadings are adequate, "the Court must carefully parse the information available to investors" to evaluate each alleged misrepresentation or omission. <u>In re Corning Sec. Litig.</u>, 2004 WL 1056063, *15 (W.D.N.Y. 2004), <u>aff'd</u>, 2005 WL 714352 (2d Cir. 2005).

8

To plead scienter, plaintiffs must "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." In re Carter-Wallace, Inc. Sec. Litig. 220 F.3d 36, 39 (2d Cir. 2000). An even more stringent scienter requirement applies to forward-looking statements, such as earnings projections, where plaintiffs must plead facts to support the strong inference that the speaker had actual knowledge that the statement was false or misleading when made. See Fellman v. Electro Optical Sys. Corp., 2000 WL 489713, *4 (S.D.N.Y. 2000). Furthermore, PSLRA requires plaintiff to link each act or omission of the defendant to the actual economic loss they incurred. Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005).

Similarly, forward-looking statements which "bespeak caution" may not form the basis of liability under the federal securities laws. See I. Meyer Pincus & Assoc. v. Oppenheimer & Co., 936 F.2d 759, 763 (2d Cir. 1991) (statements which bespeak caution rather than encourage optimism may not form basis of liability); Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) (court not inclined to impose liability because statements clearly bespeak caution).

Many of the alleged misstatements here are "puffery," which is not actionable, or are forward-looking statements that fall under the "bespeaks caution" doctrine. For example, the statement that "[the] digital portfolio continues to gain traction in the market with consumer digital cameras continuing their journey toward profitability" contains a statement of opinion, which is not

9

actionable under the Securities law. <u>See</u> <u>Lasker v. New York State</u> <u>Elec. and Gas Corp.</u>, 1995 WL 867881, *6 (E.D.N.Y. 1995); <u>aff'd</u> 85 F.3d 55 (2d Cir. 1996) ("Statements that a company... has set its most aggressive goals ever are not considered seriously by the marketplace and investors in assessing a potential investment.") (citing <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1129 (2d Cir. 1994); <u>Raab v. Gen. Physics Corp.</u>, 4 F.3d 286 (4th Cir. 1993).

Further, in Kodak's April 23, 2003 Earning's Conference Call with investors, the Vice-President of Investor Relations for Eastman Kodak, Don Flick, prefaced the call with a statement that the call would contain a number of forward-looking statements, which could be affected by risk factors including global instability, price competition, digital substitution, currency fluctuations, and other factors listed in press releases and Kodak's filings. <u>See</u> Carolyn Nussbaum Affidavit ("Nussbaum Aff."), ¶40, Ex. D, p.1. In addition, as with its other releases, Kodak warned that its forward-looking statements in the July 23 Press Release were "subject to a number of risk factors including increased competition, substitution of digital technology, and geopolitical/economic conditions." <u>See</u> Nussbaum Aff., ¶60, Ex. G, pp. 4-5; <u>see</u> <u>also</u> <u>Lasker</u>, 1995 WL 867881 at *6, ("Statements in Annual Report regarding future earnings, sales goals, and desire to achieve continued prosperity are just the sort of predictive statements that courts have found immaterial").

III. **Section 10 of the Securities and Exchange Act of 1934**.

Section 10 of the Securities and Exchange Act of 1934 provides in relevant part that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
>
> \*     \*     \*
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (1981). Federal regulations adopted pursuant to the Securities Act further provide that it shall be "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b-5.

To make out a prima facie case under Section 10(b), a plaintiff must plead "(1) a material misstatement or omission; (2) indicating an intent to deceive or defraud (scienter); (3) in connection with the purchase or sale of any security; (4) through the use of interstate commerce or a national securities exchange; (5) upon which the plaintiff detrimentally relied; and (6) where the fraud in fact caused the injuries. Lerner v. FNB Rochester Corp, 841 F. Supp. 97, 100 (W.D.N.Y. 1993) (Telesca, J.).

However, where oral statements and annual documents and disclosures truthfully disclose the risks of the investment, there is no liability under Section 1934 of the Securities Act. See  In re Hyperion Sec. Litig., 1995 WL 422480 (S.D.N.Y. 1995) (plaintiffs failed to state a claim under Sections 10(b) or 11 where investment risks were either disclosed or truthfully represented); See also Barios v. Paco Pharm. Serv., Inc., 816 F.Supp. 243, 252 (S.D.N.Y. 1993) (no claim under section 10(b) where offering document "exactly states the cautionary `fact' that the plaintiff claims has been covered up or misrepresented"); In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig., 1996 WL 551732 (S.D.N.Y. 1996) (reasonable investor could not have been misled in light of disclosures clearly set forth in 3 page section entitled "RISKS"). Accordingly, "[a] motion to dismiss may be granted upon a determination that all material factual matters have been disclosed to prospective purchasers of securities." In re Alliance, 1996 WL 551732 at *2 (citing I. Meyer Pincus, 936 F.2d at 763); Sable v. Southmark/Envicon Capital Corp., 819 F.Supp 324 (S.D.N.Y. 1993); Potomac Capital Markets Corp. v. Prudential-Bache Corporate Dividend Fund, Inc., 726 F.Supp. 87 (S.D.N.Y. 1989)).

A.    **Material misstatements or omissions**.

The first element of a 10(b) claim requires that the defendant or defendants made material misstatements or omissions in connection with the sale of securities. "For an undisclosed fact to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the "total mix" of information made available.'" Castellano, v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2nd Cir. 2001) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32, (1988) (internal quotation omitted); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). Certain kinds of statements, such as projections of future performance that are not worded as a guarantee, (often referred to as "puffery"), are per se immaterial, and thus not actionable, on grounds that no reasonable investor would be misled by vague statements of corporate optimism. In re MobileMedia Sec. Litig., 28 F.Supp.2d 901, 927 (D.N.J. 1998) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1427-28 (3rd Cir. 1997); Lasker v. New York State Elec. and Gas Corp., 85 F.3d 55, 59 (2nd Cir. 1996)); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996).

Based on this well-established precedent, it is clear that the touchstone of a materiality analysis is to determine whether or not the alleged omissions or misrepresentations would be significant to a reasonable shareholder "under all the circumstances." TSC Indus., Inc., 426 U.S. at 449-450. Courts must therefore analyze corporate statements in light of the "`total mix' of information" available to the shareholder. Id. Defendants argue that plaintiffs have not adequately alleged that Kodak's earnings projections were materially false and misleading because the information was not omitted at all but indeed was disclosed to the marketplace. When Kodak made earnings projections in its April press release and

earnings conference, it also disclosed that sales of film products in the United States had consistently decreased, most recently by 24% and that this resulted in high inventory levels by its retailers and would likely affect future sales. Kodak claims that no reasonable investor reading Kodak's disclosures could have been misled to believing that increased retailer inventories did not threaten future sales.

Next, Kodak claims that plaintiffs fail to adequately explain how the problematic mini-lab sales rendered Kodak's earning's projections false or misleading. Moreover, although Kodak did not identify Fuji by name in describing the competition it faced with respect to the mini-labs, it was under no duty to do so. See Steinberg v. PRT Group, Inc., 88 F.Supp.2d 294, 304 (S.D.N.Y. 2000). In addition, investors could not have been misled into believing there was no price competition with Fuji. Finally, Kodak contends that plaintiffs have failed to describe in sufficient detail how the alleged problematic sales practices made Kodak's earning's projections false and misleading.

Plaintiffs contend that they have pled with particularity sufficient facts to support the claim that defendants' April 2003 earnings projection was materially false and misleading because defendants knew at the time they made the statements that Kodak was plagued by substantial problems that would cause it to suffer serious shortfall and yet still told the investing public that Kodak would earn 60 to 90 cents per share. Plaintiffs claim the Complaint states multiple reasons why the April 2003 forecast was

14

not grounded in reality and therefore false at the time it was made.  First, plaintiffs allege that Kodak's film sales were virtually nonexistent in the 2nd quarter of 2003 and the rest of the year as a result of the overstocking caused by Kodak with respect to the excess multi film packs. Second, plaintiffs contend that the April forecast was unattainable because defendants knew the mini labs were plagued with problems and would produce virtually no revenue.  Third, plaintiffs allege that at the time the projections were made competition with Fuji was eroding Kodak's market share in many of its core product lines.

I find, however, that Kodak's warnings not only alerted investors of potential problems with changes in Kodak's products, but also informed investors that the company was then currently facing the very problems identified in the Complaint. In addition, even accepting plaintiffs' contention that Carp's statements in the April 23 press release that Kodak "strengthened the financial position of the company by paying down debt" was misleading, no reasonable investor would have relied on this vague remark.  See San Leandro, 75 F.3d at 806 (statement that "business is strong and growing" held immaterial). Therefore, because the "total mix" of information available to potential investors clearly informed investors that Kodak's plans were subject to risks, and clearly informed investors of the nature of those risks, the allegedly false and misleading statements made by the defendants during the class period are not material, in that based on a totality of the information, the risks that plaintiffs claim were concealed were

15

disclosed, and no reasonable investor would have been misled regarding Kodak's proposed changes.

**B.   Scienter**

Defendants contend that plaintiffs have failed to sufficiently allege scienter on the part of the defendants.  To state a claim under Section 10(b)(5) of the Securities Act, a plaintiff must state with particularity facts giving rise to a strong inference that the defendant or defendants acted with an intent to deceive, manipulate, or defraud.   15 U.S.C. § 78u-4(b)(2); Ganino v. Citizens Util. Co., 228 F.3d 154, 168 (2d Cir. 2000).  The Second Circuit Court of Appeals has held that a plaintiff may establish scienter by either "(1) identify[ing] circumstances indicating conscious or reckless behavior by the defendants, or (2) alleg[ing] facts showing a motive for committing fraud and a clear opportunity for doing so.  San Leandro, 75 F.3d at 813.

In essence, plaintiffs allege that it was fraudulent on the part of the defendants not to reveal that Kodak's future was in digital technology and not in its traditional film business. According to plaintiffs, as of April 2003 Kodak falsely made statements to the investing public leading them to believe that Kodak was and would remain in the future, a "film company."[1] Plaintiffs contend that even though Kodak knew in April 2003 that it was moving into the business of digital products, Kodak failed

---

[1]Plaintiffs claim that Kodak knew in April 2003 that it was going to transform the company to digital since its film sales were almost nonexistent in the 2nd quarter of 2003 and the rest of the year due to the overstocking of the excess multi film packs. Plus, plaintiffs contend that the April forecast was unattainable because Kodak knew the mini labs were plagued with problems and would produce no sales.

to disclose this information to the investing public until
September 25, 2003, thereby causing a reduction of Kodak's stock
value. Plaintiffs claim these facts are sufficiently persuasive to
overcome defendants' motion to dismiss.

Plaintiffs however have failed to plead a cognizable motive to
support their claim. It is clear from the record, and even from
press reports, that Kodak repeatedly disclosed that film sales were
down and that film was being replaced by digital technology.
Defendants argue that it has warned investors for years in Kodak's
annual statements and public documents[2] of its intention to
transform its business into making digital products instead of
film. For example, Kodak's 2002 Annual Report indicates that "[n]et
worldwide sales of consumer film products ... decreased 6% in 2002
as compared with 2001." See Nussbaum Aff. ¶9. Moreover, a sharper
decline was documented in the United States market. "The lower
film product sales are attributable to a declining industry demand
driven by a weak economy and the impact of digital substitution."

---

[2]The transformation from film to digital technology was reported in the news media as early as
1995, eight years prior to the purported class period. Although not a part of this record, a 1995 article of
Business Week reported that:

> Kodak began ... spending huge sums on digital imaging ... as much as $5 billion over the
> past decade. But by the time [George] Fisher [Kodak's former CEO] arrived, little had
> emerged from the labs. Some executives were gung ho, others fearful of introducing digital
> gear that would cannibalize high-margin film and paper sales....

> Fisher ended the debate. Kodak would push full-speed into digital imaging; "And if that eats
> up some of the film business, so be it."

> See Business Week, January 30, 1995, "Kodak - An Inside Look at George Fisher's Strategy."
> (emphasis supplied).

Id., Ex. A, p.26. Kodak also warned investors that digital technology was replacing traditional film products at an accelerating pace. Id. Ex. A., p. 2. Further, Kodak cautioned that due to the competitiveness of the digital industry, the process of change might be difficult.[3]  It is therefore clear that prior to September 25, 2003, the investing public was aware of Kodak's plans to emphasize and expand its digital business. Id. Ex. G, pp. 3-4.[4]

In addition, plaintiffs also contend that the defendants' motive to commit fraud was their desire to make Kodak appear more profitable than it actually was to protect the Individual Defendants' incentive-based compensation.  However, incentive compensation of the Individual Defendants had been fixed by Kodak's board before the start of the Class Period and was not subject to a vote at Kodak's annual meeting.  Moreover, "`a generalized

---

[3]The documents reflect Kodak's continued warnings regarding the shift toward digital technology:

The Company's strategy to balance the consumer shift from analog to digital, and the nature and pace of technology substitution could impact Kodak's revenues, earnings and growth rate.  Competition remains intense in the digital industry with a large number of competitors vying for customers and market share domestically and internationally.

See Ex. A. at p. 73

[4]Indeed, in discussing Kodak's success with its digital products in the marketplace, Carp reiterated in July 2003 that a fundamental shift from film to digital was underway at Kodak:

[Kodak is] evolving from a historical film company into one that is aggressively pursuing the vast potential of digital imaging across all of our operations.  We are extending the Kodak brand into the digital age so that we become known as the world's leading imaging company, building on our proud heritage as the world's leading picture company.... Additionally, our historical consumer business is getting smaller, so it is vital that the cost structure of this business reflects that reality.  We will continue to shape our company so that we remain competitive for a future in a digital world.

motive...which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.'" <u>Kalnit v. Eichler</u>, 264 F.3d 131, 140 (2nd Cir. 2001)(quoting <u>Chill v. Gen. Elec. Co.</u>, 101 F.3d 263, 267 (2nd Cir. 1996). Plaintiffs' allegations of motive are too generalized to suggest facts giving rise to a strong inference that the defendants acted with an intent to deceive, manipulate, or defraud. Thus, plaintiffs have failed to establish the scienter element under Section 10(b)(5).

**IV.**   <u>**Loss Causation**</u>

To state a claim under Section 10(b)(5), a plaintiff must show that the act complained of caused the injury suffered. <u>Bennett v. U.S. Trust Co. of NY</u>, 770 F.2d 308 (2d Cir. 1985); <u>Titan Group, Inc. v. Faggen</u>, 513 F.2d 234, 239 (2d Cir. 1975), <u>cert.</u> <u>denied</u>, 423 U.S. 840 (1975); <u>Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 495 F.2d 228, 238-39 (2d Cir. 1974). The Second Circuit has held that to establish causation, a plaintiff must show: (1) loss causation, i.e., that the misrepresentations or omissions complained of were the cause of the actual loss suffered, and (2) transaction causation, which refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities. <u>Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.</u>, 343 F.3d 189, 197 (2d Cir. 2003); <u>Citibank, N.A. v. K-H Corp.</u>, 968 F.2d 1489 (2d Cir. 1992); <u>Mfr. Hanover Trust Co. v. Drysdale Sec. Corp.</u>, 801 F.2d 13 (2d Cir. 1986).

Here, plaintiffs have failed to establish loss causation because Kodak's September 2003 announcement of cutting its dividend by 72% was not, as claimed by plaintiffs, caused by any allegedly dishonest earnings projections or by Kodak's failure to disclose its plan to move into the digital products business until September 25, 2003 even though it allegedly knew of those plans as early as Spring of 2003. The decision to direct its business focus to digital rather than film production was a strategy which Kodak had announced years earlier.[5] The September 2003 announcement emphasized a total commitment to pursue the digital strategy in replacing its prior commitment to film products.

It was Kodak's change in business strategy i.e., "digitally oriented strategy to accelerate growth," (<u>See</u> Ex. J, p. 1) that was at play during the time the drop in shareholder dividends occurred.[6] For instance, as part of its September 25, 2003 announcement Kodak noted that it had established prospective revenue targets of $16 billion by 2006 and $20 billion by 2010;

---

[5]Kodak had disclosed its shift in market strategy from film technology to digital technology as early as its 2002 Annual Report to shareholders. In reporting reduced sales of film products, the report stated, "[t]he lower film product sales are attributable to a declining industry demand driven by a weak economy and the impact of digital substitution." <u>See</u> Nussbaum Aff., Ex. A, p. 26. In the same report, Kodak warned investors that digital technology was replacing traditional film products. "For 2002, [Kodak] believes digital substitution reduced consumer film sales growth by approximately 3% in the U.S. For 2003, [Kodak] estimates that digital substitution will reduce consumer film sales growth by 4% to 5% in the U.S." <u>See</u> <u>id.</u>, p. 2. Thus, market forces preferring digital technology were seriously eroding film sales.

[6]In fact, in its September 25, 2003 announcement, Carp noted the "reality" that "demand for [Kodak's] traditional products [i.e., film photography] is declining, especially in developed markets," and outlined plans for Kodak "to become a more balanced, diversified company that is a leader in the digital markets it serves." <u>See</u> Ex. J at p. 1.

further stating that "Kodak anticipates spending as much as $3 billion in investments and acquisitions to achieve its 2006 revenue goal;" and announced that "[a]chieving the revenue goals requires that the company maintain financial flexibility" and "to that end" Kodak would be cutting its dividend from $1.80 annually to $0.50 annually.  Accordingly, Kodak made a business decision to cut the dividend by 72% so that it could "become a more balanced, diversified company that is a leader in the digital markets it serves."  See Nussbaum Aff., ¶ 67, Ex. J, p. 1. Thus, it is clear that Kodak's announcement in September 2003 to "go digital" was the culmination of a decision-making process that Kodak had been engaged in and had been contemplating for months, if not years. By that announcement, the previous historical preference for traditional film production gave way to a new focus upon digital technology.

## V.    **Section 20(a) of the Securities and Exchange Act**

To establish a claim under Section 20(a) of the Securities and Exchange Act, a plaintiff must establish "(1) a primary violation of the 1934 Securities Act, (2) scienter, and (3) control of the primary violator by the defendants."  In re 1993 Corning Sec. Litig., 1996 WL 257603, *8 (S.D.N.Y. 1996); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). Here, plaintiffs have failed to establish a primary violation of the Securities Act, and therefore have failed to sufficiently allege a violation of Section 20(a) of the Securities Act.

21

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted, and plaintiffs' complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.


                          s/Michael A. Telesca
                           MICHAEL A. TELESCA
                   United States District Judge

Dated:     Rochester, New York
           November 1, 2006